UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MARY LOU PAVAO                          :
      Plaintiff,                      :
                                      :
v.                                      :          No. 3:08CV0221 (DJS)
                                      :
TOWN OF WALLINGFORD                     :
      Defendant.                      :

MEMORANDUM OF DECISION AND ORDER

Mary Lou Pavao (the "plaintiff") brings this action against the Town of Wallingford

(the "defendant" or the "Town") alleging sex discrimination and retaliation in violation of Title

VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e et seq. ("Title VII")[1]. Now

pending before the Court is the defendant's motion for summary judgment filed pursuant to Fed.

R. Civ. P. 56. For the following reasons, the defendant's motion for summary judgment (doc. #

40) is Granted.

I. FACTS

Before reciting the facts which the Court finds to be undisputed, the Court wishes to

address an issue concerning the plaintiff's filings in opposition to the defendant's motion. The

Rules of the United States District Court for the District of Connecticut contain specific

requirements pertaining to papers filed in opposition to a motion for summary judgment. Those

papers must include a "'Local Rule 56(a)(2) Statement,' which states in separately numbered

paragraphs meeting the requirements of Local Rule 56(a)(3) and corresponding to the paragraphs

---

[1]The plaintiff's complaint had also raised claims based on the Age Discrimination in
Employment Act, 42 U.S.C. §621 et seq., as well as "violation of labor laws" and "written
employment agreements," but those claims were dismissed by the Court on June 26, 2008. (Doc.
# 23).

contained in the moving party's Local Rule 56(a)(1) Statement whether each of the facts asserted by the moving party is admitted or denied." L. Civ. R. 56(a)(2).

In the Local Rule 56(a)(2) Statement, each denial of a fact asserted by the moving party "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial. . . . The 'specific citation' obligation of this Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits . . . and to cite to specific pages when citing to deposition or other transcripts or to documents longer than a single page in length." L. Civ. R. 56(a)(3). Failure to provide this specific citation "may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." *Id.*

In opposing the defendant's motion for summary judgment the plaintiff filed an initial (doc. # 48, at 2-7) and a revised (doc. # 49-2, at 3-8) Local Rule 56(a)(2) Statement. In its reply to the plaintiff's opposition, the defendant noted that both of the plaintiff's Local Rule 56(a)(2) Statements failed to comply with the requirements of the Local Rules. In particular, the defendant noted that in some instances the plaintiff's denials did not cite to any evidence and in those instances when the plaintiff cited to evidence, i.e., her affidavit, she did not cite to a specific paragraph within her affidavit as required by the Local Rules. The plaintiff subsequently filed additional documents and a sur-reply brief in opposition to the defendant's motion for summary judgment but did not address the deficiencies in her Local Rule 56(a)(2) Statement that had been noted by the defendant.

In connection with the consideration of a motion for summary judgment, a district court is not obligated "to perform an independent review of the record to find proof of a factual dispute.

-2-

A district court is obligated only to consider the materials [properly] cited to it by the parties."

*Morales v. New York State Department of Labor*, 12-3331-cv, 2013 U.S. App. LEXIS 14306, at

*3 (2d Cir. July 16, 2013) (internal quotation marks and citation omitted). Although a district

court is not obligated to "perform an independent review of the record," given the plaintiff's *pro

se* status the Court has endeavored to determine whether her denials of facts asserted by the

defendant are supported by the evidence. In a number of instances they are not. By way of

example, the defendant's Local Rule 56(a)(1)Statement asserts that "[p]rior to Ms. Pavao's

termination, Mr. Thompson required Ms. Pavao and several male employees in the Engineering

Department (including Mr. Baltramaitis, Mr. Smith, Mr. Vanski and Mr. Krajewski) to perform

various office related duties such as filing and answering the phones." (Doc. # 40-3, at 20, ¶ 54).

The defendant cites to specific affidavit paragraphs and other evidence in support of that

assertion. In her Local Rule 56(a)(2) Statements, the plaintiff denies this assertion. One of the

Statements does not cite to any evidence; the other simply states, "See Pavao Aff., ¶ xx." (Doc. #

48, at 5, ¶ 54).  The Court has reviewed the entirety of the plaintiff's affidavit, the paragraphs of

which are not numbered, and can find no reference in the affidavit to this factual assertion. To the

extent that the defendant's factual assertions are properly supported by the evidence and the

plaintiff's denials of those assertions are not, the Court will deem those assertions admitted. *See*

L. Civ. R. 56(a)(3) ("failure to provide specific citations to evidence in the record as required by

this Local Rule may result in the Court deeming certain facts that are supported by the evidence

admitted in accordance with Rule 56(a)(1)").

  The plaintiff was employed by the defendant for over twenty years. For most of that time

she was a Draftsperson in the defendant's Engineering Department. Throughout the period of her

employment with the defendant the plaintiff was a unionized employee; the terms and conditions of her employment were governed by a collective bargaining agreement (the "CBA") between the defendant and Local 1183, Council #4 AFSCME, AFL-CIO.

On August 28, 1997, the defendant hired John Thompson ("Thompson") as the Town Engineer. Thompson served as the plaintiff's supervisor from the time he was hired until the time the plaintiff was terminated on March 9, 2005. When he was initially hired, Thompson was given the mandate to "straighten out some of the lax procedures in the Engineering Department." (Doc. # 40-5, at 2, ¶ 5). To that end he instituted changes in the operation of the Engineering Department in order to improve performance and he also required greater accountability from all of the Department's employees. The changes Thompson instituted, coupled with his aggressive and demanding management style, resulted in conflicts and confrontations between Thompson and some of the employees within the Engineering Department.

Between February 1998 and August 2004 Thompson took disciplinary actions against three male employees. These actions, which included warnings, suspensions, and a termination, were taken for the stated reasons of insubordination, failure to perform work as directed, lack of productivity, and failure to respond to requests for information about assignments or to complete required daily work schedules.

In a February 6, 1998 memo to one of those three male employees, Thompson stated, "I am extremely disappointed that you have chosen not to acknowledge, respond to, or take advantage of the Town's offer of assistance in addressing whatever issues are affecting your performance at work. . . . Effective immediately, <u>ANY</u> absence from the Engineering Department's offices . . . that has not been pre-approved in accordance with Departmental Policy,

-4-

will be recorded and logged as 'unauthorized absence.' Further, your failure to adhere to these Departmental Policies, our verbal discussions on this matter, and this specific written warning will result in the appropriate disciplinary action." (Doc. # 40-7, at 2). In a May 29, 1998 memo to that same employee, Thompson stated, "Your chosen path of defiance, disregard and challenge of authority, continues to reinforce your lack of commitment to continued employment with the Town of Wallingford. . . . This situation can not, and will not be allowed to continue. . . . This memorandum constitutes a Final Warning." (*Id.* at 4). That employee filed several union grievances against Thompson alleging that Thompson's conduct was creating a hostile working environment in the Engineering Department and subsequently retired from his position as part of the resolution of those grievances.

On January 12, 2001, Thompson notified another male employee that, "Effective immediately, Jan. 12th at 12:00 noon, you are hereby suspended for five (5) days, without pay, due to your falsification of your work records and insubordinate behavior." (*Id.* at 12). On January 18, 2001, Thompson notified the employee of a modification to the original five day suspension: "[Y]our unpaid suspension is continued until further notice . . . [and] the Town is considering significant disciplinary action against you, up to and including your termination from employment." (*Id.* at 13). Thompson subsequently notified the employee that "I am terminating your employment with the Town of Wallingford effective January 22, 2001. . . . Your performance has been unsatisfactory and unresponsive to meet the needs of the Department of Engineering." (*Id.* at 14).

In an August 21, 2003 memo to a third male employee, Thompson wrote, "Your responsibility . . . is to schedule the available personnel to provide the work product that is

needed from an overall Departmental standpoint. . . . To hear, repeatedly that you want me to tell you what to do is clearly not a desirable situation, and something quite frankly . . . that will not be debated." (*Id*. at 17). On April 28, 2004, Thompson addressed three points with that same employee: "First, while we all retain the right of free speech[,] it is becoming somewhat tiresome to continue to hear misrepresentations from members of your survey crew about the 'quality' of our design work. . . . Second, I really don't want to hear threats from members of the survey crew about holding up a job while waiting for assistance or answers to questions from you, Rob or me. . . . As the supervisor of the survey crews, there is a certain amount of responsibility for you to know what the survey crews have been working on and what the DPW construction schedule is. . . . Lastly, as I told you at our meeting on Tuesday, I will not accept, nor tolerate any willful or malicious actions that compromise the integrity of this Department or our role in DPW's construction schedule." (*Id*. at 21). On June 9, 2004, Thompson sent another memo to that employee indicating that "I was very disappointed in your assignments for the survey crews on this date . . . . I am very disappointed that you did not prepare a memo to the Department of Law . . . as I had directed you. Your response that a secretary in the Law Department said you didn't need to write a memo [] really isn't acceptable. . . .  Again, as discussed, I remain concerned about your action and the action of the other crew concerning their ability to follow an earlier directive regarding the need to radio the base on an hourly basis to report the crews location." (*Id*. at 22). That employee submitted his resignation on August 3, 2004.

The ongoing relationship between the plaintiff and Thompson was likewise quite contentious. That relationship was characterized by the defendant's Director of Public Works  as "[t]he never ending labor issues between Mary Lou Pavao and John Thompson . . . ." (Doc. # 48-

15, at 2). Between February 2000 and March 2005 Thompson issued more than thirty different counseling memoranda, verbal and written warnings, and suspensions to the Plaintiff. The stated reasons for these actions included lack of performance, lack of responsibility, insubordination, a pattern of late arrival at work, failure to respond to requests for information, lack of productivity, and failure to comply with Department directives.

In the spring of 2000 the plaintiff filed a grievance concerning Thompson's decision to suspend her for three days for insubordination. The defendant's Personnel Director concluded that the suspension was executed in a procedurally incorrect manner and the letter of suspension was removed from the Plaintiff's personnel file. On November 15, 2001, Thompson sent a letter to the plaintiff in which he rescinded a notice of indefinite unpaid suspension he had previously sent to her. On April 2, 2002, a grievance the plaintiff had filed concerning a written warning she received from Thompson was sustained. The defendant's Personnel Director determined that Thompson lacked just cause to issue the warning and that written warning was removed from the plaintiff's personnel file. Numerous other grievances filed by the plaintiff concerning disciplinary action taken against her by Thompson were denied.

On June 21, 2000, the plaintiff filed a complaint with the Connecticut Commission on Human Rights and Opportunities (the "CHRO") in which she alleged that the Town had violated Title VII and Connecticut law by discriminating against her in terms of equal training opportunities and disciplinary actions because of her sex. She later amended her complaint to allege that she had been disciplined in retaliation for having filed a CHRO complaint. The CHRO dismissed the plaintiff's case on February 13, 2002, based on its finding that there was no reasonable cause to believe that discrimination had occurred. The CHRO subsequently granted

the plaintiff's motion for reconsideration due to the CHRO investigator's failure to address the plaintiff's retaliation claim. Upon reconsideration, the CHRO again found no reasonable cause to believe that a discriminatory practice had occurred and dismissed the complaint. A second motion for reconsideration filed by the plaintiff was denied.

On February 11, 20002, the plaintiff filed a complaint with the Town in which she claimed that Thompson had "engaged in conduct that is embarrassing and humiliating to her." (Doc. # 40-8, at 2). The conduct referenced in the complaint included the following: telling the plaintiff she could not leave her chair and directing a co-worker to watch her and inform Thompson if she left her chair; ordering the plaintiff not to speak with anyone in the office and not to wait on anyone at the counter if anyone else was in the office; not introducing the plaintiff to a new employee but introducing him to all others in the office; forcing the plaintiff to sit in Thompson's office to work for the day and sit in a chair facing the wall; and forcing the plaintiff to adhere to a fixed lunch schedule, including punching out for lunch and back in from lunch at specific, exact times, while not requiring any other employee to adhere to a fixed lunch schedule. In her complaint, the plaintiff contended that these actions were taken by Thompson in retaliation for her having filed a complaint with the CHRO.

An investigation by the Town's Personnel Director into the plaintiff's complaint of conduct by Thompson concluded that his actions had "resulted in embarrassment and humiliation suffered by Pavao and embarrassment, anger and frustration by several other employees, both in and out of the department." (Doc. # 40-8, at 7). That report also found that "[t]here is no evidence that Thompson's conduct is in any way related to any complaint Pavao has filed in the past." (*Id.*). Following the issuance of the investigation report, the Town's Mayor sent a letter to Thompson

dated April 16, 2002, stating that "[y]ou must not belittle or humiliate Mary Lou [Pavao] or any employee. . . . Harassment, anger and feelings of humiliation are unacceptable in the work place. Please meet with May Lou and apologize. This letter constitutes a written warning that further mistreatment of an employee will result in further discipline." (*Id.* at 35).

On February 10, 2005, Thompson directed the plaintiff to move a number of files from her work area to other places in the office where those files belonged. At some point during that day, Thompson noticed the plaintiff making a copy instead of carrying out the assignment he had given her. At the time Thompson noticed the plaintiff making this copy, she still had approximately 170 files left to work on in her area.[2] When Thompson asked the plaintiff what she was doing, she told him she was making a copy for the file so she could keep the original for her own file. Thompson then told her to stop making copies, at which point she responded, "Well, I'll have to check with somebody." (Doc. # 40-4, at 35, p. 131: 18-19). Thompson told the plaintiff that he did not want her making copies at that time, that he wanted her originals in the files, and that he did not want any files at her desk. The plaintiff responded by saying she did not want her work thrown out.

Following the events of February 10, 2005, the plaintiff was placed on an indefinite suspension. A notice from Thompson to the plaintiff, dated February 14, 2005, indicated that "I am writing to confirm that on Monday morning (2/14/05) at approximately 8:35 AM, you were placed on unpaid suspension, until further notice. Following an investigation of this matter, I will

---

[2]The plaintiff's Local Rule 56 (a)(2) Statement appears to take issue with some of the facts alleged by the Town relating to the events of February 10, 2005. The plaintiff's Local Rule 56 (a)(2) Statement cites only to the plaintiff's own affidavit in support of this opposition, however, and the plaintiff's affidavit does not challenge any of the facts relating to the events of February 10, 2005 that appear in this decision.

be in contact with you." (Doc. # 40-6, at 44). The Town's Personnel Rules and Regulations, as revised on January 1, 2001, provided that when an employee was suspended, "[t]he Appointing Authority or his designee shall give written notice to the employee, and such notice shall state the reasons for suspension, the beginning and ending dates and other pertinent conditions." (Doc. # 50-2, at 1).

In a letter to the plaintiff dated February 18, 2005, Thompson stated, "I am writing to inform you that your suspension of February 14, 2005 will be paid and not unpaid as stated in my February 14, 2005 letter to you. As you know, I suspended you for your insubordination on February 10, 2005. You have been disciplined several times in the past for similar unacceptable conduct. You are invited to attend a meeting with me regarding your employment on February 24, 2005 . . . . The Town is considering taking significant personnel action, up to and including termination. You have engaged in willful misconduct through your numerous acts of insubordination and refusal to perform assigned work. You will have the opportunity to be heard at this meeting and you may have a union representative with you." (Doc. # 40-6, at 45).

In a subsequent letter to the plaintiff dated March 9, 2005, Thompson stated, "You were invited to attend a due process meeting and did so on February 24, 2005. You did not speak at that meeting although your union representative spoke on your behalf. Your conduct has been and remains unacceptable. All previous attempts to correct your conduct, including many unpaid suspension days, have proven to be unsuccessful. Therefore, effective today, March 9, 2005, your employment with the Town of Wallingford is terminated." (*Id.* at 46).

The plaintiff subsequently filed a grievance, which was pursued to the level of arbitration, concerning her termination. The designated arbitrator determined that "[t]he Town of

Wallingford did have just cause to terminate the grievant's employment" and for that reason

denied the grievance.  (Doc. # 40-7, at 42). The arbitrator's decision noted the following record of

disciplinary actions and corrective memos concerning the plaintiff during the time she was

supervised by Thompson:

- a written warning dated April 23, 2001, regarding performance and failure to follow instructions
- a 1.5 day suspension (reduced from 3 days) dated June 13, 2001, for refusal to respond to an inquiry from the supervisor, even after the Union urged her response
- a written warning dated July 24, 2004, for failure to carry out assignments
- a 3 day suspension, on November 14, 2000, upheld in arbitration, for failure to obey a clear order, after the Union representative instructed the grievant to sign
- a written warning dated March 22 2001, and a three day suspension dates [sic] March 23, 2001, both upheld in arbitration, for failure to follow instructions and refusing to identify a person she claimed had given her different instructions.
- a 2.5 days suspension dated June 22, 2001 (reduced by agreement from 5 days) for insubordination and failure to carry out specific directions
- a five day suspension dated July 31, 2001 for inappropriate and insubordinate behavior and failure to carry out specific work directives
- a ten day suspension dated August 29, 2001, for inappropriate and insubordinate behavior and failure to carry out specific work directives
- a five day suspension issued October 25, 2001, for insubordinate behavior and failure to carry out specific work directives
- a verbal warning dated February 9, 2004, for failure to follow up on a specific work assignment
- Numerous non-disciplinary memos regarding performance, productivity, office behavior - December 11, 2003; April 11, 2003; May 16, 2003; September 4, 2003; September 5, 2003; November 17, 2003; December 22, 2003; February 23, 2004; March 19, 2004; September 17, 2004; September 22, 2004; October 19, 2004 []
- a five day suspension dated December 2, 2004 for insubordination, upheld in arbitration
- a ten day suspension dated January 4, 2005, for insubordination, upheld in arbitration.

(Doc. # 40-7, at 44-46). According to the arbitrator, "what was demonstrated in this case was a

long and determined campaign to refuse to obey instructions, refuse to cooperate in completing the work of the department. The result was a drain on the resources of the City with hours spent by the grievant, by Mr. Thompson, by the Union officials, and by others, attempting to persuade the grievant to stop arguing and do her job. This attempt was ultimately unsuccessful." (*Id.* at 51).

## II. STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriate if, after the completion of discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (internal quotation marks omitted).

A dispute concerning a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Central School District*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The Court must view all ambiguities and reasonable inferences in the light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

The Second Circuit has "repeatedly expressed the need for caution about granting

summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute

as to the employer's intent. . . . Even in the discrimination context, however, a plaintiff must

provide more than conclusory allegations to resist a motion for summary judgment." *Holcomb v.*

*Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (citations omitted).  The nonmoving party must

"'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for

trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). "[T]he standard for determining whether the

evidence [is] sufficient to sustain the submission of plaintiff's case to the jury [is] simply whether

on the basis of that evidence, a factfinder could reasonably find the essential elements of a case

of discrimination. . . . [E]mployers should not be held liable for discrimination in the absence of

evidence supporting a reasonable finding of discrimination." *James v. New York Racing*

*Association*, 233 F.3d 149, 154-55 (2d Cir. 2000).

## III. DISCUSSION

### A. Sex Discrimination

The Plaintiff claims she was discriminated against, and ultimately terminated on March 9,

2005, on the basis of her sex. Title VII provides that it is unlawful for an employer "to discharge

any individual, or otherwise to discriminate against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such individual's . . .

sex . . . . " 42 U.S.C. § 2000e-2(a)(1).

Title VII discrimination claims are analyzed using a burden-shifting framework

articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

-13-

Under *McDonnell Douglas*, the plaintiff must carry the initial burden of establishing a prima facie case of discrimination by demonstrating that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011) (internal quotation marks omitted). If the plaintiff meets her initial burden of establishing a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. If the employer provides such a reason, "the burden then shifts back to [the plaintiff] to show 'pretext,' and, 'to defeat summary judgment[,] . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" *Govori v. Goat Fifty, L.L.C.*, 519 F. App'x 732, 734 (2d Cir. 2013).

i. Prima Facie Case

There can be no dispute that the plaintiff, who is alleging sex discrimination, is a member of a protected class or that her suspensions and termination constituted adverse employment actions.  With regard to the qualification prong of *McDonnell Douglas*, a plaintiff "need not show perfect performance or even average performance. Instead, she need only make the minimal showing that she possesses the basic skills necessary for performance of [the] job." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001 ) (internal quotation marks and citations omitted); *see Owens v. New York City Housing Authority*, 934 F.2d 405, 409 (2d Cir. 1991 ) (distinguishing the plaintiff's qualification to perform a job from her misconduct on the job).

-14-

"[W]hen . . . the employer has retained the plaintiff for a significant period of time and promoted her, the strength of the inference that she possesses the basic skills required for her job is heightened." *Gregory*, 243 F.3d at 696. The Court is satisfied that the plaintiff, who was employed by the defendant for over twenty years, meets the qualification prong of *McDonnell Douglas*.

"To complete h[er] prima facie case, plaintiff must introduce evidence that [s]he was terminated under circumstances which give rise to an inference of unlawful discrimination." *Holcomb*, 521 F.3d at 139. "[T]his [is a] low threshold, which the Supreme Court has described as 'minimal.'" *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993)). The plaintiff has introduced evidence that Thompson engaged in conduct that was embarrassing and humiliating to her, and that he failed to follow the defendant's policies and procedures when he suspended her following the events of February 10, 2005, without providing her with a written notice that stated "the reasons for suspension, the beginning and ending dates and other pertinent conditions." (Doc. # 50-2, at 1). Although it is not a clear-cut issue, the Court, recognizing that the plaintiff's burden in this regard is de minimis, will assume for purposes of this ruling that the plaintiff has established a prima facie case of sex discrimination. *See Govori v. Goat Fifty, LLC*, 2012 U.S. Dist. LEXIS 15842, at *14 (S.D.N.Y. Feb. 8, 2012) ("It is assumed for purposes of this Opinion that [the plaintiff] has carried her de minimis burden of demonstrating a prima facie case of discrimination.").

ii. Articulation of a Non-Discriminatory Reason

The defendant has met its burden of articulating a non-discriminatory reason for the

adverse employment action taken against the plaintiff. The plaintiff was suspended in February 2005 for the stated reason of "insubordination."[3] (Doc. # 40-6, at 45). The notice of termination issued by the defendant stated that "[y]our conduct has been and remains unacceptable. All previous attempts to correct your conduct, including many unpaid suspension days, have proven to be unsuccessful. Therefore, effective today, March 9, 2005, your employment with the Town of Wallingford is terminated." (Doc. # 40-6, at 46). As detailed in the arbitration decision denying the plaintiff's grievance of her termination, the defendant's action of terminating the plaintiff's employment was the culmination of a lengthy record of disciplinary actions and corrective memos concerning the plaintiff. As described by the arbitrator, "what was demonstrated in this case was a long and determined campaign to refuse to obey instructions, refuse to cooperate in completing the work of the department. The result was a drain on the resources of the City with hours spent by the grievant, by Mr. Thompson, by the Union officials, and by others, attempting to persuade the grievant to stop arguing and do her job. This attempt was ultimately unsuccessful." (Doc. # 40-7, at 51).

iii. Inference of Discrimination

Once an employer meets its burden by articulating a non-discriminatory reason for the adverse employment action, "the presumption of intentional discrimination [arising out of the prima facie case] disappears . . . ." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003). "When the defendant offers a legitimate, nondiscriminatory reason for the adverse employment

---

[3]Although the defendant's initial written notice dated February 14, 2005, did not state the reason for her suspension, (doc. # 40-6, at 44), a second notice dated February 18, 2005, did specify that the suspension was for insubordination.

action, the burden is on the plaintiff to point to evidence that reasonably supports a finding of prohibited discrimination; otherwise, the defendant is entitled to summary judgment." *Garcia v. Hartford Police Dept.*, 706 F.3d 120, 127 (2d Cir. 2013); *see also Ofoedu v. St. Francis Hospital and Medical Center*, Case No: 3:04cv1707 (PCD), 2006 U.S. Dist. LEXIS 68704, at *65 (D. Conn. Sept. 13, 2006)(internal quotation marks omitted) ("In order to defeat summary judgment, a plaintiff must . . . present evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination on the basis of [sex].").

Although the plaintiff undoubtedly has presented evidence that would support a finding of harsh treatment by her supervisor, no reasonable fact finder could conclude from the evidence in the record that adverse employment action taken against the plaintiff was based on her sex. To the contrary, the evidence demonstrates that Thompson treated male employees he supervised in a similarly harsh manner. The plaintiff argues that Thompson's actions "constituted harassment, intimidation, discrimination, and created a hostile work environment." (Doc. # 49-2, at 1). In 1998 one of the male employees supervised by Thompson filed several grievances alleging that Thompson's conduct was creating a hostile working environment in the Engineering Department. The plaintiff also contends that Thompson failed to follow applicable rules when he took disciplinary actions against her, including her right to union representation during meetings that could result in discipline. The evidence demonstrates that a male employee filed a grievance alleging that Thompson improperly denied him union representation. That grievance resulted in the defendant suspending Thompson for one week "[a]s a result of [his] failure to comply with a very clear rule in labor relations." (Doc. # 40-11, at 7).  The evidence further demonstrates that a male employee in the Engineering Department filed a grievance alleging "a violation of the just

cause provisions of the [Union] contract when Mr. Thompson issued a verbal warning" to that male employee in 2004. (Doc. # 40-7, at 20). Thompson subsequently rescinded the verbal warning to that employee.

The Court does not doubt that the plaintiff believes she was treated in an unduly harsh manner by her supervisor.  However, "Title VII is not 'a general civility code.'" *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)) ; *see also Wernsing v. Department of Human Services*, 427 F.3d 466, 468 (7th Cir. 2005) (internal quotation marks omitted) ("A district judge does not sit in a court of industrial relations. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII . . . do[es] not interfere."). The question is not whether the plaintiff has demonstrated that she was treated unfairly by her supervisor; the question is whether the plaintiff has "present[ed] evidence that would permit a rational factfinder to infer that [her] discharge was actually motivated, in whole or in part, by discrimination on the basis of [sex]." *Ofoedu*, 2006 U.S. Dist. LEXIS 68704, at *65 (internal quotation marks omitted). The Court concludes that she has not done so.

The defendant hired Thompson with the expectation that he would  "straighten out some of the lax procedures in the Engineering Department." (Doc. # 40-5, at 2, ¶ 5). His efforts to do so were not subtle and met with a good deal of resistance from some of the employees within the Engineering Department, including the plaintiff and other, male employees. Thompson did not hesitate to berate and discipline those employees he believed to be uncooperative or insubordinate. The plaintiff may have been subjected to this treatment for a longer period than some of her co-workers, but the record reflects that others who were likewise resistant to the

-18-

changes demanded by Thompson either resigned or were terminated before the plaintiff was terminated. The plaintiff's situation was aptly described by the arbitrator as "a long and determined campaign to refuse to obey instructions, refuse to cooperate in completing the work of the department." (Doc. # 40-7, at 51).   Because the plaintiff has failed to meet her ultimate burden of demonstrating intentional discrimination on the basis of sex, the defendant's motion for summary judgment is granted as to that claim.

### B. Retaliation

The plaintiff also claims that she was retaliated against, and ultimately terminated, for having complained of sex discrimination. In addition to prohibiting certain status-based discrimination, e.g., discrimination based on sex, Title VII also provides that it is unlawful for an employer "to discriminate against any . . .  employee[] . . . because [s]he has opposed any practice made an unlawful employment practice by this title, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. §2000e-3(a).

Like a Title VII sex discrimination claim, a Title VII retaliation claim is analyzed using the *McDonnell Douglas* burden-shifting framework. *See Tanvir v. New York City Health & Hospitals Corp.*, 480 F. App'x 620, 621-22 (2d Cir. 2012). Unlike a Title VII sex discrimination claim, however, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *University of Texas Southwestern Medical Center v. Nassar*, __ U.S. __,  133 S. Ct. 2517, 2533 (2013). A Title VII

status-based discrimination claim, on the other hand, is subject to what the Supreme Court has described as "a lessened causation standard" whereby a plaintiff need only demonstrate that the status at issue, e.g., sex, was a motivating factor for an employment practice. *Id.* at 2526.  The Court has already concluded that the plaintiff failed to present evidence that would permit a rational factfinder to infer that any adverse employment actions taken by the defendant were motivated, in whole or in part, by sex discrimination. The Court likewise concludes that the plaintiff has failed to satisfy the heightened but-for causation standard applicable to the plaintiff's retaliation claim.

Even if it were assumed that the plaintiff established a prima facie case of retaliation, she cannot satisfy the burden that shifts back to her after the defendant has articulated a non-discriminatory reason for adverse employment actions taken against her. The plaintiff's retaliation claim appears to rely on her contention that adverse employment actions, including suspensions and her eventual termination, occurred close in time to when she complained of sex discrimination. While "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, . . . without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). The relationship between the plaintiff and Thompson was antagonistic before she filed her complaint with the CHRO in June 2000. The plaintiff had been issued warning letters and had been suspended by Thompson in early 2000, prior to her filing a complaint of sex discrimination with the CHRO. Additionally, complaints filed by the plaintiff with the Town's Personnel Director alleging acts of harassment by Thompson dating from February 2002 through January

-20-

2005 did not include any references to discrimination on the basis of sex. The plaintiff has failed to "establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S. Ct. at 2534. For that reason the defendant's motion for summary judgment is granted as to the plaintiff's retaliation claim.

CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment (**doc. # 40**) is hereby **GRANTED**.

The Clerk is directed to close this file.

**SO ORDERED** this     9th     day of January,  2014.

_____/s/ DJS_____

DOMINIC   J.   SQUATRITO
UNITED STATES DISTRICT JUDGE

-21-